**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PUBLIC UTILITY DISTRICT NO. 1 OF
SNOHOMISH COUNTY WASHINGTON
WASHINGTON,
                        *Petitioner,*

THE WASHINGTON UTILITIES AND
TRANSPORTATION COMMISSION
(WUTC); PORTLAND GENERAL
ELECTRIC COMPANY,
                        *Intervenors,*

            v.

BONNEVILLE POWER
ADMINISTRATION,
                        *Respondent,*

_____

AVISTA CORPORATION; IDAHO POWER
COMPANY; PACIFICORP; PORTLAND
GENERAL ELECTRIC COMPANY AND
PUGET SOUND ENERGY, INC.,
                *Applicant-Intervenor.*

No. 04-74240

BPA No.
Power Act

13759

CANBY UTILITY BOARD,

Petitioner,

PUBLIC UTILITY DISTRICTS OF
CLALLAM, GRAYS HARBOR, AND
KITTITAS COUNTIES; PUBLIC UTILITY
DISTRICTS NO. 1 AND 3 OF MASON
COUNTY, WASHINGTON,

Intervenors,

v.

BONNEVILLE POWER
ADMINISTRATION,

Respondent,

AVISTA CORPORATION; PACIFICORP;
PORTLAND GENERAL ELECTRIC
COMPANY; PUGET SOUND ENERGY,

Intervenors.

No. 04-74245

BPA No.
00PB-12157

ALCOA, INC.,

Petitioner,

v.

BONNEVILLE POWER
ADMINISTRATION,

Respondent.

No. 04-74252

BPA No.
FY 2007-2011

OPINION

On Petition for Review of an Order
of the Bonneville Power Administration

Argued and Submitted
November 14, 2005—Seattle, Washington

Filed October 11, 2007

Before: Stephen Reinhardt, William A. Fletcher, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

## COUNSEL

Paul M. Murphy, Murphy & Buchal, Portland, Oregon, for petitioner Canby Utility Board.

John H. Hammond & Matthew J. Michel, Beery, Elsner & Hammond, Portland, Oregon, for petitioner Canby Utility Board.

Daniel Seligman, Seattle, Washington, for petitioner Canby Utility Board.

Michael A. Goldfarb, Law Offices of Michael A. Goldfarb, Seattle, Washington, for petitioner Public Utility District No. 1 of Snohomish County.

Terence L. Mundorf, Marsh Mundorf Pratt Sullivan & McKenzie, Mill Creek, Washington, for petitioners Public Utility Districts No. 1 of Clallam, Grays Harbor, Kittitas and Mason Counties and petitioner Public Utility District No. 3 of Mason County.

Randy Roach & Timothy A. Johnson, Bonneville Power Administration, Portland, Oregon, for respondent Bonneville Power Administration.

Karin J. Immergut, Stephen J. Odell, David J. Adler & Kurt R. Casad, United States Attorney's Office, Portland, Oregon, for respondent Bonneville Power Administration.

R. Blair Strong, Paine Hamblen, Spokane, Washington, for respondent-intervenor Avista Corporation.

Michael G. Andrea, Avista Corporation, Spokane, Washington, for respondent-intervenor Avista Corporation.

Marcus A. Wood & Stephen C. Hall, Stoel Rives, Portland, Oregon, for respondent-intervenor PacifiCorp. Scott G. Seidman & David F. White, Tonkon Torp, Portland, Oregon, for respondent-intervenor Portland General Electric Company.

Donald G. Kari & Sheree Strom Carson, Perkins Coie, Bellevue, Washington, for respondent-intervenor Puget Sound Energy, Inc.

---

## OPINION

BYBEE, Circuit Judge:

Petitioners, publicly owned utilities ("PUDs") operating in the Pacific Northwest[1] challenge contract amendments entered into in May 2004 (collectively "2004 Amendments") between the Bonneville Power Administration ("BPA") and several investor-owned utilities ("IOUs") arguing that they violate provisions of the Northwest Power Act ("NWPA"). The amendments at issue modify various provisions of several "REP Settlement Agreements" BPA entered into with IOUs in October 2000 and additionally implement a $100M "Reduction of Risk" or "litigation penalty" implemented in agreements between BPA and two IOUs, PacifiCorp and Puget Sound Energy, in May and June of 2001. In a previously

---

[1]Petitioners include Public Utility District No. 1 of Snohomish County and Canby Utility Board. Intervenors include Washington and the Washington Utilities and Transportation Commission, Public Utility Districts of Clallam, Grays Harbor and Kittitas Counties, Public Utility Districts No. 1 and 3 of Mason County, Washington.

issued opinion, we held that BPA was bound by the power exchange requirements of the Northwest Power Act and exercised its settlement authority contrary to those requirements when it entered into the REP Settlement Agreements. *Portland Gen. Elec. Co. v. BPA*, ___ F.3d ___ (9th Cir. 2007). Because BPA has not had an opportunity to determine the continued validity of the 2004 Amendments, we remand to the agency to determine in the first instance how to treat the amendments in light of our prior decision and this opinion.

## I.   BACKGROUND

Our prior opinion in *PGE* provides a thorough explanation of the underlying regulatory framework, BPA's operations, and background on the 2000 REP Settlement Agreements which form the basis of the 2004 Amendments at issue here. *See* ___ F.3d at ___. [*1 WL] Additionally, several other of our opinions chronicle the history of BPA and describe its complicated regulatory framework. *See, e.g.*, *Golden Nw. Aluminum, Inc. v. BPA*, ___ F.3d ___ (9th Cir. 2007); *Pub. Power Council, Inc. v. BPA*, 442 F.3d 1204 (9th Cir. 2006); *M-S-R Pub. Power Agency v. BPA*, 297 F.3d 833 (9th Cir. 2002) (as amended); *Ass'n of Pub. Agency Customers, Inc. v. BPA*, 126 F.3d 1158 (9th Cir. 1997). We only repeat facts necessary for the disposition of this case and refer the reader to our prior opinions for a more comprehensive explanation.

## A.   *The 2001 Load Reduction Agreements*

In 2001, while the *PGE* litigation was pending, the Pacific Northwest experienced a severe drought. Lower precipitation throughout the region coupled with prior BPA decisions and contracts (including the 2000 REP Settlement Agreements which were at issue in *PGE*, ___ F.3d ___) put the agency in a position where it could not generate enough power to meet its contractual obligations. BPA's Administrator warned in a public speech that rate increases of "250 percent or more" were possible since "BPA's obligations added up to approxi-

mately 11,000 megawatts—about 3,000 megawatts more than [its] current generating resources [could] provide on a firm basis." The Administrator advised that the only way to avoid massive rate increases was for BPA to reduce its 3,000 megawatt short position. In response, BPA developed a three-pronged Load Reduction Program involving conservation by consumers, reduction in power demand by utilities, and load curtailments by its direct service industrial customers. After negotiating several load reduction agreements with various customers, BPA was able to announce that the effort was "absolutely a stunning success" and that it only had to impose a rate increase of 46%, instead of a much higher anticipated increase.

As part of its load reduction plan, BPA entered into Load Reduction Agreements with PacifiCorp and Puget Sound Energy ("PSE") on May 23, 2001, and June 7, 2001, respectively (collectively "LRA"s). The LRAs eliminated BPAs obligation to deliver virtually all power to PacifiCorp and PSE for the FY 2002-2006 time period in exchange for cash payments.[2] One of the provisions in the LRAs provided that BPA would reduce the payments to PacifiCorp and PSE from $45.49 per MWh of foregone power to $38 per MWh if by December 1, 2001, PacifiCorp and PSE were able to negotiate and enter into litigation settlement agreements with the PUDs and other of BPA's preference customers. If the PUDs did not enter into agreements by the specified date, the clause would expire and BPA would make cash payments to PacifiCorp and PSE based on the $45.49 rate for the FY 2003-2006 period.

[2]During FY 2002, PacifiCorp and PSE each agreed to forego 10 percent of their power deliveries (25 and 37 annual aMW, respectively) in exchange for a cash payment of $20 per MWh and agreed to forgo the balance (90 percent) of the power deliveries (226 and 331 annual aMW, respectively) in exchange for a cash payment of $38 per MWh. During FY 2003-2006, PacifiCorp and PSE agreed to forego *all* of their power deliveries (241 and 368 annual aMW, respectively) in exchange for a cash payment of $45.49 per MWh, which amount would be reduced to $38 per MWh, if certain lawsuits were dismissed.

This clause—referred to as the "litigation penalty" by the PUDs and a "Reduction of Risk Discount" by BPA[3] — operated as a strong incentive for the PUDs to settle their ongoing litigation (including litigation over the 2000 REP Settlement Agreements) with BPA. If the PUDs settled, the cash payments BPA was obligated to make to PacifiCorp and PSE would be reduced by approximately $200M. If the PUDs refused to settle, they would in effect have to pay an additional $200M to acquire BPA power, as BPA announced it would recover the $200M through its wholesale power rates which would affect all of its customers, including the PUDs.

B. *The Deferral Agreements and the Failed 2003 Global Settlement*

When none of the PUDs or other of BPA's preference customers entered into settlement agreements by the December 1, 2001 deadline, BPA deferred payment of the "litigation penalty" and entered into renewed settlement talks. In anticipation of a broad settlement, PacifiCorp and PSE executed Conditional Deferral Agreements ("CDAs") in June 2002 with BPA. Under the CDAs, PacifiCorp and PSE agreed to defer payment of the $200M beginning October 1, 2002, while settlement discussions progressed. The payments would be automatically deferred for continuing six month periods unless PacifiCorp or PSE elected to terminate the deferral period. BPA agreed to pay the companies 4.46 percent interest on the $200M during the deferral period. In 2003, BPA proposed a global litigation settlement which called for the preference customers to agree to a new formula for IOU benefits for FY 2007-2011; dismiss all their pending Ninth Circuit litigation, including challenges to the 2000 REP Settlement Agreements; and enter "covenants not to sue" regarding future claims. In exchange, the IOUs would waive payment of the $200M litigation penalty. In a Record of Decision pub-

---

[3]At least one internal BPA document refers to this clause as a "litigation penalty."

lished October 21, 2003 ("2003 ROD"), BPA made it clear that if the settlement failed, it would raise rates in order to pay the litigation penalty to PacifiCorp and PSE.[4]

BPA failed to garner the required unanimous support for its settlement proposal by the January 21, 2004, deadline. A day later, BPA issued a press release announcing that the agreement had failed and giving notice that it was implementing the $200M litigation penalty: "[h]ad the proposal succeeded, BPA's wholesale power rates would have dropped by nearly 7 percent, retroactive to Oct. 1, 2003. . . . The proposed rate decrease would have been possible largely due to elimination of the $200 million in payments to investor-owned utilities. . . . In the absence of a settlement, BPA will continue to implement its existing power contracts."

## C.  *BPA's 2004 ROD and Contract Amendments*

After the global litigation settlement failed, BPA announced in a Record of Decision on May 25, 2004 ("2004 ROD"), that it had implemented several contract Amendments (collectively the "2004 Amendments") modifying the 2000 REP Settlement Agreements and establishing IOU benefits for FY 2007-2011. The Amendments include provisions that: (1) specified that BPA elected to provide payments, not physical power, pursuant to the 2000 REP Settlement Agreements and the 2001 LRAs during FY 2007-2011; (2) replaced the established rate case price forecast, which was used to calculate the cash payments BPA would make to the IOUs, with a mark-to-market methodology[5]; (3) obligated BPA not to

---

[4]The 2003 ROD specifically stated "The amount of the reduction in risk benefits, for PacifiCorp and Puget combined, is approximately $200 million. *Absent settlement, the $200 million would be included in and recovered through BPA's wholesale power rates.*" 2003 ROD at 30 (emphasis added).

[5]Mark-to-market is an accounting methodology of assigning value to a position held in a financial instrument based on the current market price for that instrument. In BPA's case, it would replace its previous rate case method for pricing its power—for the purpose of calculating the cash payments it would make to the IOUs—with a new system based on the market price for electricity.

reduce IOU benefits even if a reduction was required by Section 7(b)(2) of the NWPA; (4) establish an annual guaranteed $100M floor and a $300M cap on the financial benefits provided to the IOUs for FY 2007-2011 even if Section 7(b)(2) required reduction of IOU benefits below $100M; (5) modify the time allowed the IOUs to pass monetary benefits of the 2000 REP Settlement Agreement through to their residential and small-farm consumers; and (6) implement $100M of the "litigation penalty" embedded in the 2001 LRAs through rate increases for FY 2007-2011.[6]

Finally, the 2004 Amendments provided that if any of its provisions were held void, then the underlying agreement in effect prior to the 2004 Amendments would apply and the provisions of the 2004 Amendments would have no further force or effect unless the parties could negotiate mutually acceptable replacement terms. These 2004 Amendments form the basis of the instant litigation.

D.   *Litigation Over the 2000 REP Settlement Agreements*

In 2001, several preference customers challenged the 2000 REP Settlement Agreements. In *PGE*, we held that BPA's broad settlement authority under § 2(f) of the NWPA, 16 U.S.C. § 832a(f), did not give it license to create an exchange program divorced from the stringent requirements imposed by Congress in § 5(c) and 7(b) of the NWPA, 16 U.S.C. §§ 839c(c) & 839e(b). The agreements BPA entered into conflicted with its governing statutes and, consequently, were "not in accordance with law." 5 U.S.C. § 706(2)(A). We held that the 2000 REP Settlement Agreements which created this

---

[6]Only the contracts with PacifiCorp and PSE which implement the 2004 ROD contain provisions modifying the litigation penalty. Per the amendments, PacifiCorp and PSE agreed to forego the remaining $100M of the litigation penalty in consideration for the 2004 Amendments, but would forego the payment only if other elements of the 2004 Amendments were not found to be unlawful.

new benefit system were inconsistent with the NWPA and exceeded the authority delegated to BPA by Congress. Accordingly, we granted the petitions for review. *See PGE*, ___ F.3d at ___. [*21 WL] In a companion case dealing with the 2002-2006 wholesale power rates set by BPA, we held, among other things, that BPA violated the NWPA when it allocated to its preference customers part of the cost of the REP Settlement. *See Golden Nw.*, ___ F.3d at ___. [*1 WL]

## II.    JURISDICTION AND JUDICIAL REVIEW

**[1]** We have original subject matter jurisdiction over BPA's "final actions and decisions . . . or the implementation of such final actions" taken pursuant to the NWPA. 16 U.S.C. § 839f(e)(5). We have previously identified four types of suits for which we have jurisdiction:

> [S]uits challenging (1) the constitutionality of the Act; (2) the constitutionality of any action taken pursuant to the Act's statutory authority; (3) final actions or other decisions by BPA . . . taken pursuant to the Act's statutory authority; and (4) the implementation of final actions by BPA . . . taken pursuant to the authority of any of four enumerated federal power statutes.

*Pac. Power & Light Co. v. BPA*, 795 F.2d 810, 814 (9th Cir. 1986). Here, in deciding whether we have jurisdiction, we must determine first whether BPA's challenged action was either a final agency action or the implementation of an action and second, whether the challenge to the action was timely filed within 90 days of either a final action or implementation of a final action. 16 U.S.C. § 839f(e)(5).

**[2]** The NWPA identifies eight final actions which are expressly subject to judicial review:

> (A) adoption of the plan or amendments thereto by the [Northwest Power Planning] Council under sec-

tion 839b of this title, adoption of the program by the Council, and any determination by the Council under section 839b(h) of this title;

(B) sales, exchanges, and purchases of electric power under section 839c of this title;

(C) the Administrator's acquisition of resources under section 839d of this title;

(D) implementation of conservation measures under section 839d of this title;

(E) execution of contracts for assistance to sponsors under section 839d(f) of this title;

(F) granting of credits under section 839d(h) of this title;

(G) final rate determinations under section 839e of this title; and

(H) any rule prescribed by the Administrator under 839e(m)(2) of this title.

16 U.S.C. § 839f(e)(1). Additionally, the Act provides a jurisdictional "catch-all" for other final actions: "Nothing in this section shall be construed to preclude judicial review of other final actions and decisions by the Council or Administrator." 16 U.S.C. § 839f(e)(3). We have interpreted this "catch-all" provision to extend only to actions based on the record developed before the agency, and expressly to exclude any causes of action arising from actions divorced from and unrelated to an administrative record. *See Pub. Util. Dist. No. 1 of Clark County v. Johnson*, 855 F.2d 647, 649-50 (9th Cir. 1988) (declining to exercise jurisdiction over contract and tort claims against BPA).

**[3]** The 2004 Amendments arguably come within the enumerated actions as a "sale, exchange or purchase of electric power"; however, because they modify provisions of existing agreements, including the 2000 REP Settlement Agreements which were entered into pursuant to 16 U.S.C. §§ 839f(e)(3) and 839f(e)(1)(B), we think they are more properly analyzed under the "catch-all" provision. We only have jurisdiction under the "catch-all" provision if an agency action was "final." The Act does not specify what constitutes a "final" agency action, so we have looked to the "more general doctrine of finality in administrative agency law." *See Puget Sound Energy, Inc. v. United States*, 310 F.3d 613, 624 (9th Cir. 2002). The primary inquiry is "concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Darby v. Cisneros*, 509 U.S. 137, 144 (1993) (internal quotation marks omitted); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

**[4]** In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court held that an agency action is "final" when two conditions are met: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id*. at 177-78 (citations omitted). Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.' " *Id.* at 178 (citations omitted). Applying this test, we have found that certain factors "provide an indicia of finality, such as 'whether the [action] amounts to a definitive statement of the agency's position, whether the [action] has a direct and immediate effect on the day-to-day operations of the party seeking review, and whether immediate compliance [with the terms] is expected.' " *Indus. Customers of Nw. Utils. v. BPA*, 408 F.3d 638, 646 (9th Cir. 2005) (quoting *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 909 (9th Cir. 2003) (citations omitted)).

**[5]** Applying the *Bennett* factors, we conclude that we have jurisdiction to review the 2004 Amendments, as they are final

actions of BPA. After holding the standard notice and comment period, BPA announced its adoption of the 2004 Amendments in a Record of Decision. The 2004 ROD is the consummation of BPA's decision making process and expression of BPA's final decision on an issue. It is not merely a intermediate step. *See Ass'n of Pub. Agency Customers*, 126 F.3d at 1182-83 (treating the date of execution of the ROD as the date on which the decision becomes final). Three days after BPA issued the 2004 ROD, it executed agreements implementing the ROD with the six IOUs, Avista Corp., Idaho Power Co., PacifiCorp, Portland General Electric Co., Northwestern Energy, and Puget Sound Energy, further proof that it had reached a final decision.

[6] The 2004 Amendments also satisfy the second prong of the test: they fix specific rights from which legal consequences flow. For example, in altering the panoply of benefits BPA was giving to the IOUs, the ROD notes, among other things, that the 2004 Amendments will result in a short term rate decrease of six percent for FY 2005-2006, and a projected rate increase of one percent for FY 2007-2011 over the pre-Amendment projected rate. Additionally, in the contracts with PacifiCorp and PSE, in exchange for a waiver of $100M of the "litigation penalty," BPA agreed to apply the remaining $100M with the costs to be recouped through its FY 2007-2011 rates. Alterations and changes to existing contracts clearly have legal consequences if they directly result in rate changes to BPA customers.

[7] The 2004 Amendments did not merely change the implementation of a prior agreement. Rather they created new benefits and obligations vis-a-vis BPA's customers and, as such, constitute a final agency action. Therefore, we conclude that the 2004 Amendments meet both prongs of the *Bennett* test and their adoption is a reviewable agency action. Petitioners timely filed their challenge to the 2004 ROD within 90 days of its adoption, *see* 16 U.S.C. § 839f(e)(5), and we have jurisdiction to review their petition.

## III.   STANDARD OF REVIEW

The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, governs our review of BPA's actions. *See* 16 U.S.C. § 839f(e)(2) (incorporating the scope of review provisions of the APA). Accordingly, we may set aside BPA's decisions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See PGE*, ___ F.3d at ___; [*11 WL] *Pub. Power Council, Inc.*, 442 F.3d at 1209.

## IV.   ANALYSIS

The challenged 2004 ROD and subsequent contracts implementing the ROD alter three groups of prior agreements: the vast majority of the provisions amend contract provisions implementing the 2000 REP Settlement Agreements; the remaining provisions modify and implement various provisions of the CDAs and the 2001 LRA agreements with PacifiCorp and PSE dealing with the "litigation penalty."

In *PGE*, we concluded that BPA's settlement authority under § 2(f) of the Bonneville Project Act is subject to and constrained by the REP requirements in § 5(c) and the rate ceiling in §7(b) of the NWPA, and we held that "BPA's broad reading of its settlement authority is contrary to a plain reading of [its organic statutes], and it is inconsistent with general principles of administrative law." ___ F.3d at ___ [*14 WL]. We further held that BPA was operating from a faulty legal premise and "ignored the exchange program that Congress created in the NWPA and that BPA has implemented through its regulations," instead creating "a new residential exchange benefit system under § 2(f)." *Id.* at [*21 WL]. This we held was "not in accordance with law." 5 U.S.C. § 706(2)(A).

Specifically, we held that BPA violated congressional mandate when it implemented the REP Settlement Agreements and abandoned its traditional ASC methodology in favor of a

new calculation which took into account legal challenges and future fluctuations in the energy market. This change "served to enlarge the group of IOUs eligible for the settlement and to increase the benefits of those already qualified for the REP" and altered the allocation of the settlement benefits. *PGE*, ___ F.3d at ___ [*19 WL]. We concluded that BPA had "[i]n effect . . . settled the REP program as if it had changed its regulations, which it had not." *Id.* at ___ [*20 WL]. In addition, BPA erred in charging both its preference and non-preference customers for the costs of the REP Settlement it had created. At the time it passed the NWPA, Congress made it clear that BPA's "primary purpose remained to protect [its] preference customers and that any steps BPA took to exchange power with its non-preference customers could not result in an increase in the preference customers' rates." *PGE*, ___ F.3d at ___ [*20 WL]. We concluded that BPA acted outside the authority delegated to it by Congress when it classified the costs of the REP as a "settlement cost" to be recouped through BPA's general power rates: BPA cannot impose costs related to its REP program on its preference customers when Congress has expressly guaranteed preference customers rates as if "no purchases or sales . . . were made [under the REP program]." 16 U.S.C. § 839e(b)(2)(C); *see also PGE*, ___ F.3d at ___ [*21 WL]. Keeping these principles in mind, we now turn to the 2004 Amendments and the litigation penalty provisions.

A.  *Amendments to the 2000 REP Settlement Agreement Contracts*

   [8] The bulk of the 2004 ROD and the implementing contracts concern amendments to the 2000 REP Settlement Agreements. The continued validity of the 2004 Amendments depends on how BPA treats the underlying 2000 Settlement Agreement in light of our opinion in *PGE*. From our vantage point, BPA has at least two options. First, for example, BPA may conclude that our decisions undermined the basis for the 2000 REP Settlement Agreements and treat these 2004 agree-

ments as null and void. This would, consequently, render the provisions of the 2004 Amendments that amend the 2000 REP Settlement Agreements void *ab initio*.[7] Second, BPA might conclude that at least some of the contract provisions continue to be valid and enforceable subject to modifications to make them conform to our prior opinions and the requirements of the NWPA. From the record before us, we cannot determine BPA's likely course of action. We, therefore, remand the 2004 Amendments modifying the 2000 REP Settlement Agreements to BPA to permit it to determine, in the first instance, their continued validity in light of our recent opinions. We do so without offering any opinion as to the validity of either course of action and without prejudice to other options available to BPA.

B.    *The "Litigation Penalty" Provisions*

Petitioners vigorously challenge the "litigation penalty" provisions of the 2004 Amendments amending provisions of the CDAs and LRAs to waive $100M of the original $200M payment. Because the parties disagree whether these provisions are related to the 2000 REP Settlement Agreements at issue in *PGE* (and therefore implicated in our remand in this

---

[7]In its 2004 ROD BPA stated that the amendments (with the exception of "litigation penalty" modifications) would "become meaningless" if we were to invalidate the underlying 2000 REP Settlement Agreements. 2004 ROD at 21. The parties agreed that:

> "[i]f the courts strike down the manner in which BPA provides benefits under the REP Settlement Agreements, the foundation for the [2004 Amendments] disappears. As a result, if the court were to invalidate the REP Settlement Agreements, BPA and the investor-owned utilities have agreed that the [2004 Amendments] would be void *ab initio* since the foundation for calculating benefits in the REP Settlement Agreement would no longer exist."

2004 ROD at 11. Additionally, the contracts between BPA and each of the IOUs provide that if a court holds "section 4(c) of the [2000] Settlement Agreement [ ] void, unenforceable, or unlawful," the 2004 Amendments will be void *ab initio*.

case), or whether they are independent agreements, we address these provisions separately to provide additional guidance to BPA.

We conclude that the "litigation penalty" provisions of the LRAs are directly related to the 2000 REP Settlement Agreements PacifiCorp and PSE negotiated with BPA and not part of a separate agreement, as respondents argue. In the first place, the provisions are not an integral part of the LRAs. The contracts provide that PacifiCorp and PSE agree to a $200M "reduction" in their Settlement Agreement benefits "in the event that the respective utilities have entered into settlement agreements with certain publicly owned utility and cooperative customers that waive and dismiss legal challenges . . . to the respective utilities' original REP Settlement Agreements." 2003 ROD at 30. These provisions are not central to or directly related to the LRAs, because the penalty is only included in two of the six LRAs BPA signed with IOUs. The penalty is, rather, a direct response to the litigation over the 2000 REP Settlement Agreement and not an independent benefit or program. Furthermore, the 2001 LRA provision's implementation is contingent on the fate of legal challenges to the 2000 REP Settlement Agreements. The contracts providing for the "litigation penalty" go into effect unless BPA's preference customers "waive[ ] and dismiss[ ] legal challenges" to a variety of BPA agreements regarding its REP program, including but not limited to the REP Settlement Agreement and its subsequent amendments and accompanying RODs. *See* BPA and Pacificorp Financial Settlement Agreement at 5. The original Conditional Deferral Agreements PacifiCorp and PSE signed also linked the "litigation penalty" and the 2000 REP Settlement Agreement. The deferral contracts gave PacifiCorp and PSE the ability to terminate deferment of the "litigation penalty" if the IOUs "determine[ ] that the current comprehensive settlement efforts regarding litigation relating to [the 2000 REP Settlement Agreement] or the [2001 LRAs] are unlikely to be concluded successfully to [the IOU's] satisfaction." The provision was a way for BPA

to gain leverage over its preference customers in an attempt to broker a settlement to the legal challenges to its 2000 REP Settlement Agreements.

**[9]** Because the "litigation penalty" provisions of the LRAs, as amended by the 2004 Amendments, are sufficiently related to the 2000 REP Settlement Agreements, they must be revisited in light of our decision in *PGE*. As with the other 2004 Amendments, we cannot determine how BPA will treat these provisions. First, for example, it could determine that our prior opinions undermined the entire 2001 LRAs and, consequently, the 2004 Amendments modifying the LRAs are also void. Alternatively, BPA could determine that our decisions invalidated the "litigation penalty" provisions of the LRAs, but that those provisions are tangential to the main agreement and severable. Finally, BPA might decide to honor the "litigation penalty" provision as amended by the 2004 Amendments, but decline to charge its preference customers the cost of paying the penalty. Because we cannot determine from the record what BPA intends to do—and BPA may have other options—we remand for further proceedings. Again, we express no judgment on the merits of BPA's options or on the legality of the "litigation penalty" itself.[8]

## V.   CONCLUSION

From the record before us, we cannot determine how BPA will treat the 2004 Amendments in light of our decision in *PGE*. Consequently, we remand this case to BPA to make that

---

[8]The petitioners argue that the "litigation penalty" violates the First Amendment. *See BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002) (holding that the First Amendment right to petition the government extends to the courts); *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) (holding that the government cannot take retaliatory actions against persons because they exercise their constitutional rights); *O'Keefe v. Van Boening*, 82 F.3d 322, 325 (9th Cir. 1996) (holding that unconstitutional restrictions may arise from the "chilling" effect of government action). We decline to reach that issue here.

determination in the first instance. All remaining motions are dismissed as moot.

**REMANDED**.